13-2974-pr
*Rivas v. Fischer*

# In the
# United States Court of Appeals
## for the Second Circuit

———————

AUGUST TERM 2014
No. 13-2974-pr

HECTOR RIVAS,
*Petitioner-Appellant,*

*v.*

BRIAN FISCHER,
Superintendent, Sing Sing Correctional Facility,
*Respondent-Appellee.*

———————

On Appeal from the United States District Court
for the Northern District of New York

———————

ARGUED: DECEMBER 9, 2014
DECIDED: MARCH 11, 2015

———————

Before: CABRANES, POOLER, and SACK, *Circuit Judges.*

———————

Petitioner Hector Rivas appeals from the judgment of the
United States District Court for the Northern District of New York

(Gary L. Sharpe, *Chief Judge*) denying his amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). On March 25, 1993, a jury in Onondaga County Court in Syracuse, New York, found Rivas guilty of second-degree murder for killing his former girlfriend, Valerie Hill. At trial, the prosecution argued that Rivas killed Hill on the night of Friday, March 27, 1987. Rivas was sentenced to an indeterminate term of imprisonment of 25 years to life, which he has been serving for the last 22 years. In 1999, Rivas filed a motion for post-conviction relief pursuant to New York Criminal Procedure Law § 440.10, raising, *inter alia*, a claim of ineffective assistance of counsel and presenting essentially unchallenged expert testimony persuasively demonstrating that Hill could not have died on Friday, March 27, 1987. The Supreme Court of the State of New York, Onondaga County, denied Rivas's § 440.10 motion in its entirety.

In 2002, Rivas filed an amended petition for a writ of habeas corpus in the District Court. The District Court dismissed the petition as time-barred, and we vacated and remanded, holding that additional fact-finding on the issue of timeliness was required. After an evidentiary hearing, the District Court again dismissed the petition as time-barred. We reversed, holding that a "credible" and "compelling" showing of actual innocence warrants an equitable exception to the limitation period set forth by the Antiterrorism and Effective Death Penalty Act of 1996, allowing a petitioner to have his otherwise time-barred claims heard by a federal court. We concluded that Rivas had made such a showing, having produced essentially unchallenged expert testimony "which call[ed] into serious doubt the central forensic evidence linking him to the crime," and, as a result, "a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit." We remanded the cause for Rivas's petition to be heard on the

merits. On remand, the District Court nonetheless denied Rivas's petition in its entirety.

Because we conclude that the state court's denial of Rivas's ineffective-assistance claim involved an "unreasonable application" of *Strickland v. Washington*, 466 U.S. 668 (1984), we **REVERSE** the judgment of the District Court denying habeas relief and **REMAND** the cause. On remand, the District Court shall issue a writ of habeas corpus to Rivas by the sixtieth calendar day after the issuance of our mandate unless the state has, by that time, taken concrete and substantial steps expeditiously to retry Rivas.

———————

RICHARD M. LANGONE, Langone & Associates, PLLC, Levittown, NY, *for Petitioner-Appellant*.

PRISCILLA STEWARD, Assistant Attorney General (Barbara D. Underwood, Solicitor General, Nikki Kowalski, Deputy Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General for the State of New York, New York, NY, *for Respondent-Appellee*.

———————

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented is whether we are required to grant a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) because the state court in this case unreasonably applied *Strickland v.*

*Washington*, 466 U.S. 668 (1984), in rejecting petitioner Hector Rivas's claim of ineffective assistance of counsel.

Rivas was convicted in Onondaga County Court of second-degree murder for the death of his former girlfriend, Valerie Hill. At trial, the prosecution argued that Rivas killed Hill on the night of Friday, March 27, 1987, at her apartment in Syracuse, New York. In formulating a defense strategy, Rivas's defense counsel relied principally on Rivas's professed alibi, which placed him elsewhere for most of that weekend. Crucially, however, Rivas did not have an alibi during a key three-and-a-half hour window—between approximately 9:00 p.m. on Friday, March 27, 1987, and 12:30 a.m. on Saturday, March 28, 1987. The prosecution argued that Rivas killed Hill during this exact time frame. The prosecution's case was almost entirely circumstantial and turned on the testimony of the Chief Medical Examiner, Dr. Erik K. Mitchell.

At the time of Hill's murder, Dr. Mitchell had estimated the time of Hill's death as sometime after the close of that window—between Saturday, March 28 and Sunday, March 29, 1987. At trial nearly six years later, however, Dr. Mitchell expressed a very different opinion, testifying instead that Hill died *one night earlier*—on the evening of Friday, March 27, 1987—during which time Rivas had no alibi. Despite its critical importance to his client's case, defense counsel failed to investigate the basis for Dr. Mitchell's apparently revised findings regarding the time of death and instead relied principally on Rivas's effectively irrelevant alibi for the remainder of the weekend. After deliberating for approximately

eight hours, the jury in Onondaga County Court found Rivas guilty of second-degree murder. He was subsequently sentenced to an indeterminate term of imprisonment of 25 years to life.

On July 12, 1999, Rivas, with new counsel, filed a motion for post-conviction relief pursuant to New York Criminal Procedure Law § 440.10, raising, *inter alia*, a claim of ineffective assistance of counsel. In his motion, Rivas presented essentially unchallenged expert testimony persuasively showing that Hill in fact died sometime after 3:30 p.m. on Saturday, March 28, 1987, casting grave doubt on the prosecution's theory that Hill was murdered on Friday night. In his § 440.10 filing, Rivas also presented compelling evidence further discrediting Dr. Mitchell. Rivas's filing alleged that Dr. Mitchell had perjuriously purported to base his time-of-death opinion in part on "brain slides" that, Rivas later learned, were non-existent. Rivas also introduced evidence that, at the time of Rivas's trial, Dr. Mitchell was under investigation by state and local agencies (including possibly the office of the prosecutor who charged Rivas) for various forms of misconduct. At trial, Rivas's counsel failed to challenge Dr. Mitchell's reliance on the non-existent "brain slides," or to cross-examine him regarding the investigations into his alleged misconduct that were pending at the very time of the prosecution of Rivas.

On September 8, 2000, the Supreme Court of the State of New York, Onondaga County, denied Rivas's § 440.10 motion, holding, *inter alia*, that "[d]efense counsel employed a trial strategy based upon a defense that defendant was sufficiently alibied for the entire

weekend, . . . and that the People would not be able to prove defendant's guilt beyond a reasonable doubt [as to] whether the jury found that the crime occurred on Friday night or on Saturday night." *People v. Rivas*, No. 92-2794, slip. op. at 34–35 (N.Y. Sup. Ct. Sept. 8, 2000). On June 19, 2002, Rivas filed an amended petition for a writ of habeas corpus in the United States District Court for the Northern District of New York, raising substantially the same claims that he advanced in his § 440.10 motion. The District Court (Gary L. Sharpe, *Judge*) dismissed Rivas's petition as time-barred under 28 U.S.C. § 2254(d). *See Rivas v. Fischer*, No. 01-cv-1891, ECF No. 21 (N.D.N.Y. Jan. 28, 2005). We vacated and remanded, holding that additional fact-finding on the issue of timeliness and actual innocence was required. *See Rivas v. Fischer*, 294 F. App'x 677, 678–79 (2d Cir. 2008).

After a hearing, the District Court again dismissed the petition as untimely. *See Rivas v. Fischer*, No. 01-cv-1891 (GLS/DEP), 2010 WL 1257935 (N.D.N.Y. Mar. 26, 2010). We reversed, holding as a matter of first impression in this Circuit that a "credible" and "compelling" showing of actual innocence warrants an equitable exception to AEDPA's limitation period, allowing a petitioner to have his otherwise time-barred claims heard by a federal court. *Rivas v. Fischer*, 687 F.3d 514, 517–18 (2d Cir. 2012). We concluded that Rivas had made such a showing, having produced essentially unchallenged expert testimony "which call[ed] into serious doubt the central forensic evidence linking him to the crime," and, as a result, "a reasonable juror, apprised of all the evidence in the record,

6

would more likely than not vote to acquit." *Id.* at 552. We remanded the cause for Rivas's petition to be heard on the merits. After hearing oral argument, the District Court nonetheless denied Rivas's petition in its entirety. *See Rivas v. Fischer*, No. 01-cv-1891 (GLS), 2013 WL 4026844 (N.D.N.Y. Aug. 6, 2013).

We now reverse. We hold that, in viewing all the circumstances at the time, no reasonable argument can be made that Rivas's defense counsel satisfied his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. We further hold that no reasonable argument can be made that defense counsel's deficient performance did not prejudice the defense. *See Strickland*, 466 U.S. at 687. As a result, the state court's conclusion to the contrary involved an "unreasonable application" of *Strickland*. 28 U.S.C. § 2254(d)(1).

Accordingly, we **REVERSE** the judgment of the District Court denying habeas relief and **REMAND** the cause. On remand, the District Court shall issue a writ of habeas corpus to Rivas by the sixtieth calendar day after the issuance of our mandate unless the state has, by that time, taken concrete and substantial steps expeditiously to retry Rivas.

## BACKGROUND

We previously set forth the relevant facts in our prior opinion, *Rivas v. Fischer*, 687 F.3d 514 (2d Cir. 2012). We incorporate those facts herein by reference and reproduce the relevant portions here:

**[BEGINNING OF QUOTED PASSAGES FROM OUR PRIOR 2012 OPINION][1]**

**A.     The Murder of Valerie Hill**

At approximately 11:45 a.m. on Monday, March 30, 1987, Randall Hill ("Randall") discovered the lifeless body of his twenty-eight-year-old daughter, Valerie Hill ("Hill"), on the living-room floor of her apartment on Hickok Avenue in Syracuse, New York. Transcript of the Trial of Hector Rivas (March 17, 1993) ("Trial Tr.") at 103.

Randall had last seen his daughter on Friday night, March 27, when the two met for dinner at a nearby restaurant. He later recalled that Hill seemed upset during their meeting and did not eat anything. *Id.* at 96–98. During their conversation, Hill informed her father that she was planning to spend the weekend visiting a friend in the Albany area and would not return until Sunday evening. *Id.* at 99. Hill left the restaurant at approximately 8:15 p.m. on Friday. *Id.* at 97–98. The friend Hill planned to visit, Laura Adams, later testified that she called Hill "dozens of times" on Friday night and throughout the weekend, but never

---

[1] Although our previous recitation of the facts drew from both the record of Rivas's state collateral proceeding and the evidentiary hearing held by the District Court, *id.* at 518, our review under 28 U.S.C. § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits," *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The footnotes within the quoted passages are numbered as in the original. Brackets are used to correct typographical errors.

reached her, although she encountered at least one "busy" signal. *Id.* at 217–19, 221. Randall also had no success when he attempted to call Hill on Sunday night and again Monday morning. *Id.* at 99–100.

On Monday morning, Randall went to the hospital where Hill was employed as a pediatric nurse (and where Randall's wife was then admitted as a patient) and discovered that Hill had not reported to work. *Id.* at 101, 103. Concerned, he drove to Hill's apartment, where he found her car parked in the driveway. Randall let himself in through the unlocked side door and discovered Hill lying "face down on the carpet" in her living room. She was wearing a bathrobe, which was pulled "up around her shoulders," and was otherwise naked. *Id.* at 100–03. The belt of the bathrobe was wrapped around her neck. *Id.* at 157.

Randall immediately called the police, as well as his son, David. *Id.* at 104. Arriving at the scene, police investigators found no signs of forced entry into Hill's apartment, which was on the bottom floor of a two-family house. *Id.* at 107, 228–29. The apartment was "very neat," and nothing appeared to be out of order. *Id.* at 228. A number of cigarettes of the brand Rivas smoked were found in an ashtray in Hill's kitchen. *Id.* at 150–51, 638. Later testing revealed that fingerprints on the ashtray, as well as on a bottle of wine, belonged to Rivas. *Id.* at 591–93.[2] In addition to Rivas's and Hill's

---

[2] Rivas, having dated Hill, had been in her apartment many times before and it was undisputed at trial that he had been

fingerprints, an unidentified set of prints was taken from the telephone. *Id.* at 588. Missing from the apartment was an airline ticket that Hill had collected from her travel agent on the afternoon of Friday, March 27.

After learning from Randall and David that Hill had recently broken up with Rivas, police officers went to Rivas's house in Cazenovia, a town about twenty miles southeast of Syracuse. *Id.* at 235. Rivas agreed to accompany the officers to the Syracuse police station. Sergeant John D. Brennan later testified that Rivas appeared nervous,[3] but was cooperative and did not inquire as to why he was being questioned. *Id.* at 237–28. At the police station, Rivas was taken to an interrogation room where police proceeded to question him for approximately twelve hours. Despite the fact that he was interrogated at length regarding his activities the weekend of Hill's death, Rivas was never informed of his *Miranda* rights because, the police officers later insisted, he was not regarded as a suspect at that time. Trial Tr. at 239. At approximately 5:30 p.m., after over two hours of questioning, police informed Rivas that Hill had been killed. According to Brennan,

---

in her apartment as recently as Thursday, March 26, 1987. *Id.* at 240.

[3] However, another officer who interviewed Rivas that day, Frank Pieklik, testified at a pretrial motions hearing that Rivas "appeared, as I recall, quite normal." Transcript of Feb. 24, 1993, Hearing ("Pretrial Hearing Tr.") at 30 (Feb. 24, 1993).

Rivas exhibited no discernible reaction upon hearing this news. *Id.* at 247.

During the interview, Rivas told the police that he had last seen Hill four days earlier, on the evening of Thursday, March 26, 1987, when he had gone to her house and talked to her for half an hour. *Id.* at 240. He had also driven by Hill's apartment at 2:00 p.m. the following day, Friday, March 27, and again approximately four hours later, at 6:00 p.m. He claimed he did not linger on either occasion after discovering that Hill was not home. *Id.* at 240–41. Rivas said that he had spent most of Friday evening with friends at various bars in Syracuse and Cazenovia. *See* Trial Exh. 1. He stated that he was at Coleman's Bar ("Coleman's") in Syracuse from about 6:00 to 11:00 p.m. He then went to Albert's Bar ("Albert's") in Cazenovia and stayed there until 2:00 a.m., before returning to Syracuse to get breakfast at an all-night diner. He finally went home and fell asleep at 4:00 a.m. Rivas claimed that he awoke at 11:30 a.m. on Saturday and returned to Albert's to do some plumbing work. He remained for lunch and then went home to take care of some yard work. He then returned to Albert's to watch Syracuse compete in the "Final Four" of the NCAA Men's Basketball Tournament. He remained at Albert's until approximately 8:00 p.m., whereupon he went to a party at a friend's house until 4 a.m. on Sunday, March 29, before returning home to bed. As Rivas stated in the interview, many people saw him and spoke with him on Saturday night. *Id.*

While Rivas was being questioned at the station, other police officers put together an application for a warrant to search his residence. Attached to the application was an affidavit signed by Officer Timothy Phinney, attesting that there was probable cause to believe that several items would be found in Rivas's home, including a key to Hill's apartment and clothing soiled with blood, fecal matter, or other contaminants. *See* Motion to Vacate Sentence Pursuant to Criminal Procedure Law 440.10 ("Section 440.10 Mot.") Exhs. 1 & 2. The affidavit also stated that the Onondaga County Medical Examiner, Dr. Erik Mitchell, had preliminarily estimated the time of Hill's death to be "sometime [between] [S]aturday the 28th of March afternoon and [S]unday morning [the] 29th of March 1987." *Id.* Exh. 2.[4]

---

[4] Contemporaneous newspaper articles also reported that Mitchell had estimated the time of death to have been sometime late Saturday night, March 28, to early Sunday morning, March 29. *See, e.g.*, Mike McAndrew, "As Wife Lay Dying, Man Found His Daughter Slain," *The Syracuse Post–Standard*, Apr. 1, 1987, at A1 ("Onondaga County Medical Examiner Erik Mitchell has determined that Hill was strangled late Saturday or early Sunday, Deputy Police Chief Robert Galvin said."); John Doherty, "Police Have No Clues into Slaying of Nurse," *The Syracuse Post–Standard*, Apr. 1, 1987, at B3 ("An autopsy has determined that Valerie J. Hill . . . was strangled to death with the cloth belt of her bathrobe, police said. The report also indicated that she died sometime Saturday or early Sunday morning, police said.").

We take judicial notice of "the *fact* that press coverage contained certain information, without regard to the truth of [its] contents." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008).

In the basement of Rivas's house, investigators discovered a damp jacket draped over a clothesline. Trial Tr. [at] 274–75. Although a search of household trash was not expressly contemplated by the warrant, investigators also seized and reconstructed a torn-up note, which they found in a trash bag in Rivas's kitchen.[5] The note was from Hill to another former boyfriend, Bob Lucas, expressing her thanks for their time together. *See* Trial Exh. 5.[6] Finally, inside a bedroom closet, investigators observed what they described as a "shrine," consisting of a large statue of the Virgin Mary surrounded by two small candles and a photograph of Hill. Trial Tr. at 270–74, 316. Although photographs were taken of the trash bag that contained the note, as well as other items in Rivas's house, no photograph was taken of the "shrine." *See id.*

---

[5] Rivas later argued that the note had been recovered from Hill's apartment and not his. *See* Mem. Supp. § 440.10 Mot. at 34.

[6] The note was admitted at trial over Rivas's objection. On direct appeal, the Appellate Division of the New York Supreme Court held that the note should have been suppressed because it was not within the scope of the warrant and did not fall under the "plain view" exception, but that its improper admission at trial constituted harmless error. *See People v. Rivas*, 214 A.D.2d 996, 626 N.Y.S.2d 640, 641 (4th Dep't 1995). [In our prior opinion, we explained that, because] in reviewing a claim of actual innocence we consider "all the evidence ... without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," *House*, 547 U.S. at 538, 126 S. Ct. 2064 (internal quotation marks omitted), we need not ignore the contents of the note.

Despite a thorough investigation, neither Rivas nor anyone else was charged with, or even publicly identified as a suspect in, Hill's murder, which remained a "cold case" for five years.

## B.     The Indictment of Hector Rivas

In January 1992, William J. Fitzpatrick was sworn in as District Attorney of Onondaga County, having previously served in that office as an Assistant District Attorney. According to his biography on the Onondaga County District Attorney's website, when he was Chief Assistant District Attorney, "Fitzpatrick specialized in re-opening cases that had previously been considered inactive and, with the cooperation of various police agencies in Onondaga County and the state of New York, he brought numerous killers to justice in cases that were thought to be un-winnable." *See* "Meet the DA," Office of the Onondaga District Attorney, www.ongovda.net/section/meet_the_da/ (last visited May 30, 2012).

On November 22, 1992, nearly six years after the murder of Valerie Hill, a grand jury indicted Rivas on charges of murder in the second degree and aggravated sexual abuse. It is not clear what, if any, new evidence might have come to light that would lead authorities to pursue, and the grand jury to indict, Rivas nearly six years after the murder. In its Bill of Particulars, responding to a defense request for the date when Rivas was first identified as a possible perpetrator of the crime, the prosecution stated, simply: "It is very difficult to respond to this request. Defendant was

indicted in November 1992." *See Rivas v. Fischer*, No. 01–cv–1891, (N.D.N.Y. Sept. 18, 2009), ECF No. 55–2 at 56 (Answering Affidavit).

Rivas contends that, sometime after becoming District Attorney, Fitzpatrick approached Mitchell, the medical examiner, and requested that he review Hill's autopsy report with an eye toward expanding the time of death to include Friday, March 27, 1987, when Rivas's alibi was not as strong. According to Rivas, at the time this alleged request was made, Mitchell "was under criminal investigation by DA Fitzpatrick's office, as well as by the Department of Health and the Department of Environmental Conservation" for varieties of misconduct, including improper disposal of waste and stealing and mishandling of body parts. Appellant's Br. at 8.

The State concedes that Mitchell was accused of various forms of misconduct as early as 1989, *see* Appellee's Br. at 24, and does not dispute that he was under investigation by the State Department of Health at the time he testified against Rivas. It is also undisputed that Mitchell resigned in November 1993, in part to avoid prosecution by the District Attorney's Office. *See* Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] at 205.[7] It is not clear from the record, however, at

---

[7] Mitchell's decision to resign was widely reported in the local newspapers. *See, e.g.*, John O'Brien & Todd Lightly, "DA: Mitchell 'Went Too Far': Medical Examiner, Accused of Mishandling Body Parts, Quits Under Pressure," *The Syracuse Post–Standard*, Nov. 20, 1993, at A1 ("Thursday, Fitzpatrick told

what point the District Attorney's Office opened its criminal investigation into Mitchell's conduct.[8] Though Rivas's state post-conviction attorneys submitted requests under New York's Freedom of Information Law requesting information regarding the investigation, the County provided only one page (a press release) in response, maintaining that other materials were non-final agency records and attorney work product. *See* Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] at 208. Rivas's attorneys also persuaded a

---

Mitchell's lawyer that if Mitchell resigned, the criminal investigation would end."). In the separate investigation by the State Department of Health, Mitchell was later cleared of wrongdoing. *See* Jim O'Hara, "Ex–Medical Examiner Cleared of Wrongdoing: Mitchell was Accused of Improperly Harvesting Body Parts," Syracuse Post–Standard, Nov. 16, 1995, at B1.

[8] The investigation was triggered when two subordinates publicly accused Mitchell of misconduct. These self-styled "whistleblowers" submitted statements that were included in the record of Rivas's initial appeal to this Court. One subordinate claimed to have witnessed Mitchell "slant the interpretation of evidence and/or exclude evidence to serve his predetermined objectives," and averred that "Dr. Mitchell's opinions and interpretations of evidence cannot be trusted as impartial or accurate." Aff. of William R. Sawyer at 5–7 (quoted in Joint App'x at 337 n.7). Another—who was himself fired at the same time Mitchell resigned, and later had his medical license revoked for persistent drug and alcohol abuse—claimed that Mitchell had instructed him to fashion his autopsy reports in a way that would allow for manipulation of the case findings and had remarked that "the medical examiners worked for Onondaga County and were there to serve the needs of the District Attorney's Office." Letter of David A. Rigle at 16 (quoted in Joint App'x at 337 n.7).

state Supreme Court justice to conduct an *in camera* review of the County's investigation of Mitchell in 1998, but the judge determined that the documents would not be provided to Rivas.[9]

In any case, whether it was out of an "eager[ness] to please the prosecutor," Appellant's Br. at 5, as Rivas suggests, or based upon an independent reevaluation of the medical record, it does appear that sometime in 1992, Mitchell reconsidered his estimate of the time of death. The grand jury's indictment alleges that Rivas killed Hill "on or about" Friday, March 27, 1987. The State has identified no new evidence that came to light between March 1987 and November 1992 that led to the indictment.[10] As far as the record reflects, therefore, the only thing that changed during that span of time was the medical examiner's estimation of the time of death.

---

[9] The judge did, however, inform one of Rivas's attorneys that Fitzpatrick was scheduled to attend a meeting with a legislative committee regarding allegations against Mitchell on April 13, 1993, just over two weeks after the conclusion of Rivas's trial. *See* Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] 117–19.

[10] It appears that the only new evidence prosecutors employed at Rivas's trial was the testimony of a former friend, who stated that Rivas made an incriminating statement to the effect that he "didn't mean to do it" shortly after Hill's death. *See* Trial Tr. at 816–17. However, prosecutors evidently did not learn of this alleged statement until after the indictment was returned, when the witness's girlfriend came forward. *See id.* at 828–29.

### C.    The Trial of Hector Rivas

Rivas was tried before a jury in March 1993, with now-deceased Onondaga County Court Judge J. Kevin Mulroy presiding. He was represented by Richard J. Calle, an attorney then practicing in Queens, New York. Rivas, who had moved downstate, hired Calle because Calle happened to be representing him in a civil arbitration matter in the fall of 1992, around the time the District Attorney's Office renewed its investigation of him in connection with Hill's murder. *See* Section 440.10 Hearing Tr. at 11. Calle did not work out of a formal business office and, on the occasions that he met with Rivas prior to Rivas's incarceration, those meetings were typically held in Rivas's sister's apartment or at a local diner.[11]

### 1.    *The People's Direct Case*

The People's case was almost entirely circumstantial.[12] District Attorney Fitzpatrick, who tried the case himself, presented Rivas as an obsessive, jilted

---

[11] Calle was later indicted and convicted on federal charges of obstruction of justice and mail fraud unrelated to his representation of Rivas. He was disbarred from the practice of law in New York State nine years after Rivas's trial. *See In re Calle*, 301 A.D.2d 218, 749 N.Y.S.2d 528 (1st Dep't 2002).

[12] Several of Rivas's fingerprints had been found on items in Hill's house, including a bottle of wine. However, the prosecution acknowledged at trial that Rivas had been in the apartment many times before, including in the week prior to Hill's death.

lover who harassed Hill following their breakup and was pushed over the edge when he learned that Hill was planning to take a trip to the Bahamas alone. Trial Tr. at 1127–28. As Fitzpatrick summarized: "Hector Rivas stalked this woman [for] two and a half months, and finally strangled her and killed her in a jealous rage on March the 27th of 1987." *Id.* at 1069.

Trial testimony and exhibits supported at least part of this theory. Friends of Hill testified that Rivas persisted in contacting Hill on a regular basis, even after she had made clear that she did not want to continue or revive their relationship. In addition, the prosecution introduced dozens of notes, cards, and letters that Rivas had written to Hill in the months between their breakup and her death. *See id.* at 1092–97. Police investigators also testified regarding Rivas's strange behavior when he was first questioned, including his lack of reaction when he was told that Hill had died. *Id.* at 247.

Several witnesses testified regarding Rivas's whereabouts on Friday, March 27, 1987, the alleged date of the murder. Taken together, the testimony of these witnesses suggested that there may have been a window of time during which Rivas could have gone to Hill's house and strangled her while en route from Coleman's in Syracuse to Albert's in Cazenovia, about thirty minutes away. Prosecution witnesses testified that Rivas left Coleman's at around 9:00 or 9:30 p.m. and did not arrive at Albert's until sometime between 11:00 p.m. and 12:30 a.m. *Id.* at 461–63, 439–40, 849. One witness, a clerk at a liquor store near Hill's apartment, testified that he saw Rivas enter the store between 9:30

and 10:00 p.m. *Id.* at 496–99. Two witnesses testified that they observed Rivas smoking a cigarette in his car, which was parked outside Hill's house, sometime between 11:00 p.m. and 12:00 a.m. that night—around the time that the prosecution theorized Hill was murdered. *Id.* at 533–34, 936–37.[13]

Beyond making the case that Rivas had motive and the opportunity to murder Hill on Friday night, Fitzpatrick deftly turned Rivas's alibi for Saturday against him. Through witness testimony and in his opening and summation, Fitzpatrick suggested that Rivas had contrived to be seen by many people at all hours of the day Saturday and into Sunday morning, so that he would have an alibi in the event that police focused on Saturday evening as the time of death. *See, e.g., id.* at 1084, 1124. For example, Elizabeth Lewis, one of Hill's friends, testified that Rivas sought her out at a party Saturday evening and remarked that "[i]t's too bad Valerie's not feeling well, that she can't be here tonight." *Id.* at 780. The implication, according to the prosecution, was that Rivas wanted to plant the idea in Lewis's mind that Hill was alive on Saturday evening,

---

[13] One of these witnesses, Hill's upstairs neighbor, was in fact called by Rivas as a defense witness, apparently because she had initially told police that she had seen Hill in their shared basement on Saturday morning, March 28. However, under cross examination by Fitzpatrick, she readily conceded that she was mistaken in her initial statement to police and had in fact seen Hill on Friday morning, March 27. Trial Tr. 928–29, 932.

knowing that he was at that very moment cementing his alibi. *See id.* at 1124.[14]

Similarly, Fitzpatrick emphasized a seemingly exculpatory item of evidence: a Stephen King novel that Hill had checked out from the Cazenovia Public Library, and which a witness had seen in the back seat of Hill's car on Friday afternoon. *See id.* at 190–91. The book was returned to the library's drop box sometime between Saturday afternoon and Sunday morning, suggesting that Hill (the most likely person to have returned it) was alive at least as late as Saturday afternoon. But Fitzpatrick theorized that it was Rivas who returned the book, hoping that it would cause investigators to believe that Hill was not killed on Friday night, when his alibi was relatively weaker. *Id.* at 54–55, 1085.[15]

---

[14] Lewis did not testify that Rivas claimed to have spoken to Hill on Saturday. However, it was her sense, six years later, that he was trying to convey the impression that he had. This purported plan backfired, because Lewis—unlike Rivas—knew that Hill was planning to be out of town that weekend. Rivas's comment therefore struck her as odd. Trial Tr. [at] 780.

[15] As Rivas pointed out in his state collateral motion, however, Hill had requested the book through an interlibrary loan and all of the markings on the book indicated it was from a different library, in Utica. Thus, Rivas (belatedly) argued, only Hill would have known to return it to Cazenovia library and not the original library. Furthermore, although the prosecution's fingerprint expert examined the book and found three prints that he could not identify, he apparently did not recover any of Rivas's prints from the book. *See* Trial Tr. at 588.

Finally, [Fitzpatrick] elicited testimony from Joe Fields, an acquaintance of Rivas, who encountered him at Albert's bar approximately three weeks after the murder. Rivas had been drinking heavily and was crying over Hill's death. According to Fields, at a moment when Rivas did not know that Fields was in earshot, he said to himself, "Valerie, Valerie, I didn't mean to do it." *Id.* at 817–18.

2.  *The Medical Examiner's Testimony*

No matter how much circumstantial evidence the prosecution could amass tending to link Rivas to the crime, however, it had no case unless it could prove that Hill died on Friday night. Fitzpatrick himself acknowledged that Rivas's alibi was "complete—for Saturday night." *Id.* at 55. Indeed, it was the People's position that Rivas's alibi was so strong on Saturday night precisely because he had concocted it, having murdered Hill the night before. Therefore, the prosecution's case rested almost entirely on the testimony of Mitchell, the medical examiner, to persuade the jury that Hill died on Friday night and not on Saturday as Mitchell had initially determined.

Mitchell testified that, when he first observed Hill's body on the afternoon of Monday, March 30, it "was in rigor," and that by the time he performed an autopsy later that day, "[s]he was coming out of rigor." *Id.* at 869, 872.[16] He cautioned that no medical examiner

---

[16] In the "scene investigation" report that Mitchell prepared and signed at the time of his initial inquiry into the

can pinpoint with certainty the time of a person's death, *id.* at 886, but stated that, based on his observations of the body, there was nothing inconsistent with Hill having died on either the night of Saturday, March 28, or Friday, March 27. *Id.* at 888. However, taking into account a number of external factors—namely, that Hill's cat was seen outside on Saturday morning; that Hill had not been seen after Friday; that she never contacted the friend whom she intended to visit that weekend; that her car had apparently not been driven since Friday; and that she had not been in touch with her father despite the fact that his wife was gravely ill—Mitchell opined that "it's more likely that she died Friday night, to possibly very early Saturday morning" than on Saturday night. Trial Tr. [at] 889–90. He also stated his opinion "within a reasonable degree of medical certainty" that Hill died as a result of being strangled. *Id.* at 891.[17]

Confronted on cross-examination with contemporaneous newspaper accounts that reported on his preliminary findings, Mitchell admitted that he "[q]uite possibly" had estimated at some point that Hill died late on Saturday night or early Sunday morning.

---

cause and time of Hill's death, he reported that he had found Hill's body in "*full* rigor, with fixed anterior livor." *See* Remand Hearing Tr. [at] 75–76[, dated Sept. 21 & 22, 2009] (emphasis added).

[17] Whether by design or oversight, Mitchell did not testify that his opinion on Hill's time of death was "within a reasonable degree of medical certainty." Trial Tr. at 891.

*Id.* at 895–96.[18] Mitchell also conceded that, when he testified before the grand jury in November 1992, he had stated that it was merely "on the outside edge of [ ] possibility" that Hill could have been murdered on Friday night. *Id.* at 907. At trial, however, he insisted that he had never "tied [himself]" to a Saturday night estimate. *Id.* at 895. He stressed that the onset and relaxation of rigor mortis was highly variable and could be slowed, for example, by cold temperatures. *Id.* at 905–06. Although Mitchell thus acknowledged that in most cases rigor mortis relaxes within twenty-four to forty-eight hours (which would put Hill's time of death somewhere between Saturday and Sunday afternoon), he suggested that the cool temperatures in Hill's apartment could have retarded the process.

On redirect examination, Mitchell explained that, when he testified before the grand jury several months earlier, he had not reviewed "some of [his] notes and slides." *Id.* at 915. Having had the opportunity to review the "slides" before trial, he noticed in them "some

---

[18] Although Calle attempted to impeach Mitchell with newspaper articles suggesting that Mitchell had initially estimated the time of death to be [Saturday] night, he did not refer to the police affidavit supporting the application to search Rivas's residence, which stated that Mitchell had preliminarily estimated the time of Hill's death to be "sometime [between] [S]aturday the 28th of March afternoon and [S]unday morning [the] 29th of March 1987," Section 440.10 Mot. Exh. 2. *See* Section 440.10 Hearing Tr. at 98.

decomposition to the brain." *Id.* This, he stated, "tends to push the [time] limits further out." *Id.*[19]

### 3. Belated Disclosure of Exculpatory Evidence

At the close of the People's case, Fitzpatrick disclosed the existence of an August 1988 affidavit from one Joe Morgan, in which Morgan attested that an individual named Patsy Barricella had admitted to Morgan that he (Barricella) murdered Hill. Trial Tr. at

---

[19] Rivas contends that Mitchell committed perjury when he testified that he had examined "brain slides," because the medical examiner's file did not, in fact, contain any such slides. The state concedes that there were no "brain slides"—that is, sectional slides containing actual brain tissue. It argues, however, that there were in fact two photographic slides containing images of Hill's brain, and that Mitchell may have been referring to those slides in his testimony.

We need not, and therefore do not, address Rivas's allegation that Mitchell committed perjury. We note, however, that Fitzpatrick specifically characterized the slides in question as "autopsy sectional slides" in his closing argument. Trial Tr. at 1082–83. Furthermore, Rivas's expert, Dr. Cyril Wecht, has testified [at the federal evidentiary hearing before the District Court in 2009] that a forensic pathologist would "not use the word slide synonymously with a photograph." Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] at 27. In any case, Wecht has also testified [before the state collateral review court in 1999] that, even if Mitchell had examined "brain slides" (that is, sectional slides), such a review is "totally unreliable" as a means of determining the time of death, because the sections of the brain contained in such slides continue to decompose for up to ten days after the brain is placed in a formalin bath for preservation. *See* Aff. of Cyril H. Wecht[, dated June 11, 1999,] Supp. Section 440.10 Mot. at 6.

947–48.[20] Recognizing that this evidence was "exculpatory without a doubt," *id.* at 984, the trial judge allowed Calle, Rivas's attorney, to decide whether to adjourn and attempt to call Morgan or Barricella as witnesses, or instead to bring out the information contained in the affidavits by examining the Syracuse police officer who had interviewed Morgan. Calle opted to draw the information out of the police officer, Michael Ostuni. *Id.* at 987. According to [Officer] Ostuni, Morgan claimed that he had a conversation with his friend and neighbor Barricella in March 1988, at which time Barricella confessed to killing "the girl on Hickok Avenue." Section 440.10 Mot. Exh. 8. In addition, Barricella had, according to Morgan, driven by the crime scene several times as police were investigating Hill's murder and was stopped by police as a result. (Indeed, a contemporaneous police report revealed that Barricella was stopped by police after driving by the crime scene repeatedly. *See* Section 440.10 Mot. Exhs. 9 & 10.) However, on cross-examination by the District Attorney, Ostuni also testified that Morgan was a con artist and career criminal who had contacted the police from a county jail cell, demanding release as a *quid pro quo* for cooperation. Trial Tr. at 998–1000. Ostuni further

---

[20] Though it is unclear when Fitzpatrick first became aware of or obtained Morgan's affidavit itself, the trial transcript suggests that he was in possession of at least some documents relating to Morgan before opening statements were made, and thus well before this information was turned over to the defense. *See* Trial Tr. at 65.

testified that Barricella was known to be "mildly mentally retarded." *Id.* at 1001.

### 4. *Rivas's Direct Case*

Beyond the testimony of Ostuni, Rivas's direct case was underwhelming. As Calle later testified, he did not appreciate at trial that the precise time of Hill's death was important because he felt that Rivas had a strong alibi throughout the entire weekend. He therefore never considered calling an expert forensic pathologist to challenge Mitchell's adjusted findings. *See* Section 440.10 Hearing Tr. at 85, 87. He did attempt to establish that Hill was alive on Saturday by calling a prosecution witness, Hill's upstairs neighbor, to read from an affidavit in which she had stated that she had seen Hill in their shared basement that morning. However, on cross-examination by Fitzpatrick, the witness readily conceded that she had been mistaken in her affidavit and had in fact seen Hill on Friday morning, not the following day. *See* Trial Tr. at 927–932. Calle also attempted to establish Rivas's alibi by calling a single witness who claimed to have seen Rivas at Albert's in Cazenovia as early as 7:30 p.m. on Friday. *Id.* at 967. Finally, he called a witness who testified that Rivas was acting normally on Saturday night. *Id.* at 974. Rivas did not testify in his own defense, and claims that Calle never informed him of his right to do so. Section 440.10 Hearing Tr. at 17–18.

### 5. *Summations*

In his closing argument, Calle argued that the Hill murder had been solved backwards: The police and

the District Attorney's Office had decided at the outset that Rivas was the killer and then set out to find, or fabricate, the proof of the murder from there, ignoring other potential leads along the way. Trial Tr. at 1044. With respect to the time of death, Calle argued that Mitchell had to stretch science beyond the breaking point to opine at trial that it was more likely that Hill had been killed on Friday than on Saturday, when Mitchell had previously testified before the grand jury that a Friday time of death was only "on the outside limits of possibility." *Id.* at 1062. Calle did not explicitly challenge Mitchell's credibility or suggest that he might be beholden to the District Attorney's Office. Indeed, Rivas claims that neither he nor Calle were aware of the investigations into Mitchell's conduct at the time of the trial, despite their widespread publicity in the weeks leading up to it, apparently because they both then lived downstate. *See* § 2254 Petition at iv; Remand Hearing Tr.[, dated Sept. 21 & 22, 2009,] at 271–72.

Fitzpatrick, in his summation, defended Mitchell's estimates:

> [A]s [Dr. Mitchell] told the grand jury, rigor mortis, the stiffening of the body after death, normally begins to pass off within 24 to 48 hours. If we were looking at a calendar, this would put the normal time of death or the normal median time of death sometime Saturday afternoon. Could it have been 16, 17, 18 hours earlier? Absolutely. Absolutely. Heating conditions refer, first of all, to 75 degrees. It wasn't the

temperature of the house. The temperature of the house was 62 degrees. . . . Basement underneath her, cold floor. And the nights as you might expect, in March of 1987 were cold as well.

Trial Tr. at 1082–83.[21] Furthermore, Fitzpatrick argued, Mitchell had "had a chance to review autopsy sectional slides of the brain," *id.*, which tended to expand the range of possible times of death. This review, Fitzpatrick claimed, combined with the external indications Mitchell had identified, had led Mitchell to opine that it was most likely that Hill died on Friday, March 27.

---

[21] In fact, the temperature of the apartment was never recorded and Hill was lying on a carpeted floor. The record also reveals that the week of Hill's death was unusually warm. One witness told police that the last time she had seen Hill, Hill was sunbathing in her backyard. Section 440.10 Mot. Exh. 24. Another witness stated that she had her window open late Saturday night, when she heard a woman's scream. *Id.* Exh. 4.

Parenthetically, we note that, according to the National Climatic Data Center, the mean temperature in Syracuse, NY, on March 27, 1987, was 51° Fahrenheit, with a high of 61° and a low of 40°. On March 28, the temperature ranged from 37–65° with a mean of 51°. And on Sunday, March 29, the day before Hill's body was discovered, the high temperature was 74° and the low 36[°] with a mean of 55°. *See* Local Climatological Data, Monthly Summary for Syracuse, NY, March 1987, *available at* http://www7.ncdc.noaa.gov/IPS/lcd/lcd.html?_finish=0.400803217 488396 (last visited July 3, 2012).

Summarizing the evidence against Rivas, Fitzpatrick theorized that Rivas had paid Hill a visit on Friday night after he left Coleman's bar, and had brought over a bottle of rum and a bottle of wine in hopes that the two could mend their relationship. When he discovered that Hill not only did not want to reunite with him, but was also planning a trip to the Bahamas alone, he flew into a rage and strangled her. Then, realizing he needed to cover up the crime, he got rid of the airline ticket (but left an ashtray full of his cigarettes), and, on the way to his car, took Hill's library book from the back seat of her car, intending to return it the next day to make it appear as though Hill were still alive. He then crafted a tight alibi for the rest of the weekend. *Id.* at 1125–30.

The jury deliberated for eight hours over the course of one day, during which time it asked for further instructions on the meaning of "reasonable doubt." *Id.* at 1188. At approximately 10:45 p.m. on March 25, 1993, nearly six years to the day after Valerie Hill was killed, Hector Rivas was found guilty of second-degree murder. He was subsequently sentenced on May 12, 1993, to an indeterminate term of imprisonment of twenty-five years to life.

## D.    State Post–Conviction Proceedings

Rivas, with the assistance of new counsel, appealed his conviction to the Appellate Division of the New York Supreme Court . . . . On April 28, 1995, the Appellate Division issued a decision unanimously affirming Rivas's conviction. *People v. Rivas*, 214 A.D.2d

996, 626 N.Y.S.2d 640 (4th Dep't 1995) . . . . Rivas's application for leave to appeal to the New York Court of Appeals was denied on August 15, 1995. *People v. Rivas*, 86 N.Y.2d 801, 632 N.Y.S.2d 514, 656 N.E.2d 613 (1995) (table).[22]

Thereafter, with the assistance of yet another lawyer, Rivas filed a motion to vacate the judgment of conviction pursuant to N.Y. Criminal Procedure Law § 440.10, which provides the means of collateral attack on a criminal judgment in New York state courts. In that application, Rivas alleged that he had been the victim of a "concerted effort to convict that was severed from concerns over actual guilt very early on in this investigation and was orchestrated by the District Attorney himself, William J. Fitzpatrick, who personally prosecuted this case." Affirmation of H. Mitchell Schuman in Support of Section 440.10 Mot. at 3.

Principal among Rivas's allegations was that Mitchell, the medical examiner, had altered his original estimate of the time of Hill's death in order to satisfy the District Attorney in hopes of avoiding prosecution for alleged criminal misconduct. *Id.* at 4–7. Rivas claimed not to have known about the investigation of Mitchell and his office until after the trial, when Mitchell was indeed forced to resign to avoid prosecution by

---

[22] Rivas also filed an application for a writ of error *coram nobis*, which was denied by the Appellate Division on September 27, 1996. *People v. Rivas*, 231 A.D.2d 971, 647 N.Y.S.2d 648 (4th Dep't 1996) (Table).

Fitzpatrick's office. *Id.* at 6. Additionally, Rivas claimed to have discovered only after the trial that, despite Mitchell's testimony that he had examined "slides" in coming to the conclusion that Hill most likely died on the night of Friday, March 27, 1987, and despite Fitzpatrick's characterization of these slides in his summation as "autopsy sectional slides," there were in fact no sectional slides of Hill's brain in the medical examiner's file. *Id.* at 6–7.

Rivas also pointed to "new evidence," in the form of an affidavit by Dr. Cyril H. Wecht, an expert in forensic pathology, who attested that Mitchell's calculations of the cause of death were "misguided," and that, in his expert opinion, "based upon a reasonable degree of medical certainty, . . . the length of time between the death of Valerie J. Hill and the time she was found was less than 48 hours, *and more likely less than 36 hours*." Affirmation of Cyril H. Wecht in Support of Section 440.10 Mot. (emphasis in original). In other words, according to Wecht, Hill most likely died between 3:30 p.m. on Saturday, March 28, and 3:30 a.m. on Sunday, March 29.

In addition, Rivas alleged that a significant amount of exculpatory material was withheld from the defense at trial. Most saliently for our purposes, Rivas claimed that he never received an affidavit taken from one of Hill's neighbors, Mary Lazarski, and a police report memorializing an interview with another unnamed neighbor. In her affidavit, Lazarski attested that, late in the evening of March 28 or early in the morning of March 29, while she was watching

"Saturday Night Live" on television, she heard through her open window "a loud shriek or scream [that] seemed to cut off." Section 440.10 Mot. Exh. 4. She stated that "[t]he voice was a woman's voice and it sounded like someone was in trouble and not like anyone kidding around." *Id.* Lazarski's husband also signed an affidavit confirming that his wife woke him up and told him about the incident that night. *Id.* The unidentified neighbor told police that he heard a dog barking and a car speed away from the vicinity of Hill's house at around 11:00 Saturday night. *Id.*

Beyond these documents, Rivas claimed that the prosecution failed to disclose: (1) a police report regarding an interview with a neighbor who had seen Hill intimately embracing a man other than Rivas a few days prior to her murder, and another interview stating that Hill had been involved in an intimate relationship with a man other than Rivas at the time of her death; (2) information that one of Hill's neighbors had previously been arrested for burglary and was known to peer through windows in the neighborhood;[23]

_____

[23] This neighbor appears to have been a member of the family [that] lived upstairs from Hill at 250 Hickok Avenue. The individual was interviewed by police in connection with Hill's murder and admitted to having been arrested and charged in 1985 with a burglary of 248 Hickok Avenue, the apartment later occupied by Hill. (He was ultimately convicted of petit larceny, according to the report.) When questioned about his whereabouts the weekend of Hill's death, he mentioned having "pass[ed] by his parents house at 250 Hickok Avenue." Section 440.10 Mot. Exh. 18. Although it appears that the individual had an alibi for

(3) information that an employee at the hospital where Hill worked had been disciplined after Hill made a complaint against him; (4) information regarding a purported "sexual deviant" who was residing in Hill's neighborhood; (5) the fact that one of the prosecution witnesses had a prior conviction; and (6) the affidavit stating that Patsy Barricella, not Rivas, had committed the crime. Section 440.10 Mot. at 7–10.

Finally, Rivas raised a claim of ineffective assistance of counsel, alleging that his trial attorney, Calle, had failed to apprise him of his right to testify in his own defense, and had failed to "investigate or challenge the false and misleading testimony given by the medical examiner at trial." Mem. Law. Supp. Section 440.10 Mot. at 34–40.

On April 7, 2000, Acting Onondaga County Supreme Court Justice John J. Brunetti conducted an evidentiary hearing in connection with Rivas's § 440.10 motion. At the close of the hearing, Justice Brunetti issued an oral ruling denying relief with respect to Rivas's *Brady* claims and one portion of his ineffective-assistance claim, finding that Rivas had not borne his burden of persuasion on those points. *See* Section 440.10 Tr. at 135–41. After taking the remaining issues under

---

the relevant time period, the very fact that he was questioned by police and had previously been arrested for suspicious criminal activity involving Hill's apartment, if disclosed to the defense, would likely have provided grounds for challenging the credibility of his family members, who testified against Rivas.

34

advisement and receiving post-hearing briefs from the parties, Justice Brunetti issued a written decision on September 8, 2000, denying relief on the remaining claims. *See People v. Rivas*, No. 92–2794 (N.Y. Sup. Ct. Sept. 8, 2000).

**[END OF QUOTED PASSAGES FROM OUR 2012 OPINION]**

*Rivas*, 687 F.3d at 518–30.

## E.    Federal Habeas Proceedings

On June 19, 2002, Rivas filed an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising substantially the same claims that he advanced in his § 440.10 motion.[24] The District Court dismissed Rivas's petition as time-barred under 28 U.S.C. § 2254(d), *see Rivas v. Fischer*, No. 01-cv-1891, ECF No. 21 (N.D.N.Y. Jan. 28, 2005), and we vacated and remanded, holding additional fact-finding on the issues of timeliness and actual innocence was required, *see Rivas v. Fischer*, 294 F. App'x 677, 678–79 (2d Cir. 2008).

After an evidentiary hearing, the District Court again dismissed the petition as untimely. *See Rivas v. Fischer*, No. 01-cv-

---

[24] In addition to his ineffective-assistance claim, Rivas re-raised his various claims under *Brady v. Maryland*, 373 U.S. 83 (1963), *People v. Sandoval*, 34 N.Y.2d 371 (1974), and the Due Process Clause. Because we grant Rivas's petition on the basis of his ineffective-assistance claim, we need not address these other claims.

1891 (GLS/DEP), 2010 WL 1257935 (N.D.N.Y. Mar. 26, 2010). We reversed, holding as a matter of first impression in this Circuit that a "credible" and "compelling" showing of actual innocence warrants an equitable exception to AEDPA's limitation period, allowing a petitioner to have his otherwise time-barred claims heard by a federal court. *Rivas v. Fischer*, 687 F.3d 514, 517–18 (2d Cir. 2012).[25] We concluded that Rivas had made such a showing, having produced essentially unchallenged expert testimony "which call[ed] into serious doubt the central forensic evidence linking him to the crime," and, as a result, "a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit." *Id.* at 552. We remanded the cause for Rivas's petition to be heard on the merits.

After hearing oral argument, the District Court nonetheless denied the petition on the merits. *See Rivas v. Fischer*, No. 01-cv-1891 (GLS), 2013 WL 4026844 (N.D.N.Y. Aug. 6, 2013). With respect to Rivas's ineffective-assistance claim, the District Court held that the state court's determination "was comprised of both reasonable factual determinations and a reasonable application of *Strickland*." *Id.* at *22. The District Court reasoned that defense counsel's decision to rely on Rivas's incomplete alibi was sound trial strategy because

---

[25] The Supreme Court subsequently confirmed in *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013), that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." *See id.* at 1931 (citing *Rivas*, 687 F.3d at 547–48).

36

"[e]ven if Rivas employed an expert who reached the same conclusions as Dr. Wecht . . . the time of death would simply be limited to sometime between 3:30 P.M. on Saturday and 11:30 A.M. on Monday," and "Rivas was, by his own account, alone during a large portion of Sunday, beginning at 4:00 A.M." *Id.* at *33. With respect to prejudice, the District Court held that "[a]s discrediting Dr. Mitchell would not narrow the time of death to a period during which Rivas could not have committed the murder, so too would it fail to alleviate the considerable circumstantial evidence suggesting his involvement in Valerie's death." *Id.* at *34.

This appeal followed.

## DISCUSSION

We review a district court's denial of a petition for a writ of habeas corpus *de novo*, *Alvarez v. Ercole*, 763 F.3d 223, 229 (2d Cir. 2014), and we review the underlying state court's denial under 28 U.S.C. § 2254(d) for an "'objectively unreasonable'" application of clearly established federal law, *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000)).[26]

Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides "[t]he statutory authority of federal courts to issue habeas corpus relief for

---

[26] *See Harrington v. Richter*, 562 U.S. 86, 101–02 (2011) (distinguishing between *de novo* review and review for objective unreasonableness).

persons in state custody." *Harrington*, 562 U.S. at 97. Section 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Rivas contends that the state court's denial of his ineffective-assistance claim involved an "unreasonable application" of *Strickland* under Section 2254(d)(1).[27] The Supreme Court has explained that an "unreasonable application" is one that is "more

---

[27] There is no dispute that *Strickland* constitutes "clearly established Federal law." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011).

than incorrect or erroneous"; it must be "objectively unreasonable." *Wiggins*, 539 U.S. at 520–21 (internal quotation marks omitted). In other words, the state court's decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

*Strickland* has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. Where, as here, a petitioner's claim stems from a "strategic choice[] made after less than complete investigation," such a choice is reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

In assessing whether counsel exercised "reasonable professional judgment," our "principal concern . . . is not whether

39

counsel should have presented" the additional evidence that further investigation would have revealed, but rather, "whether the investigation supporting counsel's decision not to introduce" the additional evidence "*was itself reasonable*." *Wiggins*, 539 U.S. at 522–23. In doing so, we look to "not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.

Finally, our scrutiny of counsel's performance must be "highly deferential" because we must apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Similarly, under Section 2254(d), "the range of reasonable applications is substantial," so when *Strickland* and Section 2254(d) apply in tandem our review must be "doubly" deferential. *Harrington*, 562 U.S. at 105 (internal quotation marks omitted). Therefore, the relevant question "is not whether counsel's actions were reasonable," but instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 102. Our analysis must "determine what arguments or theories supported . . . the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent" with *Strickland*. *Id.*

## A.

Rivas contends that his trial counsel, Calle, was ineffective because he did not investigate further into the basis of Mitchell's

revised findings as to the time of Hill's death. Rivas argues that Calle should have, among other things: (1) consulted with or retained a competing forensic pathologist, who would have found that the revised findings were not scientifically reliable; (2) researched Mitchell's qualifications and background, which would have revealed that he had been accused of, and was under pending investigation for, various forms of misconduct at the time of trial; (3) reviewed the documents relied upon by Mitchell, which would have revealed that he based his revised opinion in part on nonexistent "brain slides"; and (4) used as impeachment evidence a search warrant application in which a Syracuse police officer swore that Mitchell had previously estimated the time of Hill's death as "sometime Saturday the 28th of March afternoon, and [S]unday morning the 29th of March 1987."

At the state 440.10 hearing, Calle attempted to justify his limited investigation as reflecting a tactical judgment to pursue an alternative strategy. He testified as follows:

> Q. Did you consider getting an expert witness regarding time of death?
>
> A. No, I didn't.
>
> Q. Okay. Could you tell us what your— what your thoughts were on that at the time of the trial?
>
> A. I was under the belief—I was under the belief that Mr. Rivas did not commit this crime.

41

Q. Mm, hmm.

A. I was under the belief that the cause of death was not a significant issue to his defense—

Q. Mm, hmm.

A. —because he wasn't the one who committed that.

Q. Mm, hmm.

A. I believe that he had an alibi for the entire weekend.

Q. Mm, hmm.

A. The Friday there was a number of affidavits of people at bars in Cazenovia, Albert's and another bar, I can't recall the name, which placed him at that location some many miles away. In fact, Mr. Rivas and myself had gone up there conducting an investigation together and it didn't seem to me to be pertinent—

Q. Mm, hmm.

A. —before the trial to determine if in fact the cause of death was a significant issue, because six years before the indictment the coroner, if that's what you call him, he had indicated that death was either Saturday or Sunday and then six years later determined

it was Friday and I thought that I would be able to impeach his credibility which would prevent the District Attorney's office from proving the crime beyond a reasonable doubt. . . .

THE COURT: Can I just interrupt? You used a term "cause of death". I'm understanding you to mean time of death or am I incorrect?

THE WITNESS: No, I did mean cause of death. That's why I think I didn't give significant attention to the—the—the retention of an expert coroner to refute the findings of Dr. Mitchell.

THE COURT: And because there was you felt he was well alibied?

THE WITNESS: Yes, sir.

Section 440.10 Hearing Tr. at 85–87; *see also id.* at 94–95, 97–98. The state collateral review court credited this explanation, finding that "[d]efense counsel employed a trial strategy based upon a defense that defendant was sufficiently alibied for the entire weekend . . . and that the People would not be able to prove defendant's guilt beyond a reasonable doubt whether the jury found that the crime occurred on Friday night or on Saturday night." *People v. Rivas*, No. 92–2794, slip op. at 34–35 (N.Y. Sup. Ct. Sept. 8, 2000). The state court concluded that "counsel formulated a trial strategy, it was an

objectively reasonable one, and it was executed in a reasonably competent manner." *Id.* at 34. We disagree.

The record demonstrates that Calle relied on three sources in formulating his "strategy": (i) Rivas's alibi, (ii) a newspaper article reporting that Mitchell had previously estimated the time of death as Saturday, March 28, or early Sunday morning, March 29, *see* Trial Tr. at 895, and (iii) Mitchell's grand jury testimony, in which he had stated that a Friday time of death was "on the outside edge of possibility," Trial Tr. at 907, 1062. Rather than justifying a decision not to investigate Mitchell's findings further, however, this evidence would have led any reasonable attorney to conclude exactly the opposite: further investigation was absolutely vital.[28]

Critically, Rivas's alibi was uncorroborated and incomplete for a key three-and-a-half hour window—between approximately 9:00 p.m. on Friday, March 27, 1987, and 12:30 a.m. on Saturday, March 28, 1987. *See* Trial Tr. at 440, 461–63, 469, 487–88, 849.[29] Not

---

[28] The Supreme Court explained in *Strickland* that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." 466 U.S. at 688. The American Bar Association standards in effect in 1993 stated that "[d]efense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case." ABA Standards of Criminal Justice: Prosecution and Defense Functions § 4-4.1(a) (3d ed. 1993); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (finding ABA Standards useful "'guides to determining what is reasonable'" (quoting *Wiggins*, 539 U.S. at 524)).

[29] Indeed, the two witnesses who demonstrate that Rivas's alibi was incomplete for these key three-and-a-half hours, Mark Brosh and Beverly

coincidentally, the core of the prosecution's case was that Rivas killed Hill during this exact time frame. *See, e.g.*, Trial Tr. at 31, 56, 1069, 1083, 1125–26. The indictment charged Rivas with killing Hill "on or about the 27th day of March"; the People's Bill of Particulars stated that Rivas was alleged to have killed Hill "[o]n March 27th, 1987 between the hours of 9:00pm and 12:00 midnight at 248 Hickok Avenue in the City of Syracuse"; the prosecution argued repeatedly in its opening and its closing that Rivas killed Hill on Friday, March 27, 1987, Trial Tr. at 31, 56, 1069, 1083, 1105, 1125–26; indeed, it argued that Rivas's alibi was "complete" for Saturday night, March 28, 1987, precisely because he had concocted it, having murdered Hill on Friday, March 27, Trial Tr. at 55; and finally the Certificate of Conviction states that Rivas was indicted for, and convicted of, second-degree murder "committed on March 27, 1987." We are not persuaded by the District Court's speculation that counsel may not have wanted to make an issue of "a narrowed time of death" because of the "risk of fixing the jury's attention on a time frame during which, by his own account, Rivas' whereabouts could not be corroborated [*i.e.*, between 4:00 a.m. and 11:00 a.m. Sunday morning when Rivas was sleeping]." *Rivas*, 2013 WL 4026844, at *33. At no point did the prosecution argue that Rivas murdered Hill on Saturday or Sunday. The District Court's conjecture regarding counsel's motivations—which appears nowhere in the state

---

Dorland, were listed on Rivas's own notice of alibi, albeit apparently misspelled. *See* Notice of Alibi, *People v. Rivas*, Index No. 92-2794 (Onondaga Cnty. Ct.), *available at Rivas v. Fischer*, No. 01-cv-1891, ECF No. 55-2 at 42 (N.D.N.Y.).

collateral review court's decision or in Calle's testimony at the state 440.10 hearing—resembles "more a *post hoc* rationalization of counsel's conduct than an accurate description of [his] deliberations." *Wiggins*, 539 U.S. at 526–27.

The case therefore turned on rebutting the prosecution's theory as to the time of death.[30] Inexplicably, however, Calle relied on a strategy that was completely divorced from this central issue: He relied on an alibi defense when, in fact, Rivas did not have an alibi for the precise time that the prosecution claimed Rivas had murdered Hill. In effect, Calle's alibi defense amounted to no defense at all. No "fairminded jurist[]," *Harrington*, 562 U.S. at 101, could agree that this decision constituted "sound trial strategy," *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Accordingly, the state court's conclusion to the contrary was objectively unreasonable. *See Wiggins*, 539 U.S. at 521.

As to the newspaper article and grand jury testimony, this evidence also compelled further investigation. By Calle's own admission, this evidence armed him with the knowledge that Mitchell had apparently changed his estimate as to the time of death six years after the fact, seemingly on the basis of no new evidence.

---

[30] As we previously stated, "it was the People's position that Rivas's alibi was so strong on Saturday night precisely because he had concocted it, having murdered Hill the night before. Therefore, the prosecution's case rested almost entirely on the testimony of Mitchell, the medical examiner, to persuade the jury that Hill died on Friday night and not on Saturday as Mitchell had initially determined." *Rivas*, 687 F.3d at 524.

*See* Section 440.10 Hearing Tr. at 85–87. Coupled with the fact that the prosecution's case turned entirely on linking Hill's death to a time when Rivas had an incomplete alibi, this knowledge would have led any reasonable attorney to conclude that investigating the basis of Mitchell's new findings was essential.[31] Rather than investigate further, however, counsel's investigation inexplicably stopped there, a decision Calle was unable to justify as consistent with his constitutional "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Considering all the circumstances, no "fairminded jurist[]" could agree that the quantum of evidence known to Calle at the time justified his decision to forego further investigation and rely instead on a critically deficient alibi and two perfunctory items of impeachment evidence that only scratched the surface of Mitchell's revised findings. *Harrington*, 562 U.S. at 101; *see also Wiggins*, 539 U.S. at 527 ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision . . . .").

---

[31] The Supreme Court has "recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts. . . . This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses." *Hinton v. Alabama*, 134 S. Ct. 1081, 1090 (2014); *see also id.* at 1088 ("'Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence.'" (quoting *Harrington*, 562 U.S. at 106)).

In sum, this is the exceedingly rare and exceptional case where the state court's decision involved an "unreasonable application" of *Strickland*. 28 U.S.C. § 2254(d).

## B.

Having established deficient performance, Rivas must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. It is well established that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

We previously held that Rivas had presented a "credible" and "compelling" claim of actual innocence for purposes of establishing an equitable exception to AEDPA's limitations period—that is, Rivas established that "a reasonable juror, apprised of all the evidence in the record, would more likely than not vote to acquit." *Rivas*, 687 F.3d at 552. The Supreme Court has held that this standard, which we previously concluded Rivas had met, requires "a stronger showing than that needed to establish prejudice" under *Strickland*. *Schlup v. Delo*, 513 U.S. 298, 327 & n.45 (1995). Accordingly, for substantially the same reasons, we now hold that Rivas has established that, absent his counsel's unprofessional errors and omissions, a factfinder would have had a reasonable doubt

respecting his guilt. *See Strickland*, 466 U.S. at 695.[32] Specifically, as we previously observed, those reasons were as follows:

> Ultimately . . . it does not matter how much indirect, circumstantial evidence the State amassed to suggest that Rivas killed Hill on Friday night, if she in fact died [at another time] . . . . Therefore, the question turns almost entirely on the relative credibility of the prosecution's expert, Mitchell, and Rivas's expert, Wecht. In this regard, we stress once more that the State, despite having the opportunity to challenge Wecht's [affirmation before the state collateral review court], or to [submit] its own expert to support Mitchell's conclusions, failed to raise any serious question about Wecht's qualifications or conclusions. We therefore are left to weigh the unchallenged [affirmation] of a renowned forensic pathologist—who concluded "to a reasonable degree of medical certainty" that Hill could not have

---

[32] As we previously noted, our review is limited to the record before the state court that adjudicated Rivas's claim. *See supra* note 1 (quoting *Pinholster*, 131 S. Ct. 1398). For purposes of the present appeal we do not rely on Dr. Wecht's testimony from the federal evidentiary hearing but note that Dr. Wecht's unchallenged affirmation, which was submitted to the state collateral review court, reached the same conclusions. Aff. of Cyril H. Wecht, dated June 11, 1999, ¶ 17, *available at Rivas v. Fischer*, No. 01-cv-1891, ECF No. 56-2 at 23 (N.D.N.Y. Sept. 18, 2009).

died on Friday—against the testimony of a disgraced and allegedly beholden medical examiner, who initially told police that Hill died on Saturday evening, later told the grand jury that it was on the "outside edge of possibility" that she died on Friday evening, and finally testified, without reference to any degree of medical certainty, that it was "more likely" that she died on Friday night. . . .

Finally, though we do not suggest that Mitchell intentionally lied on the stand or that District Attorney Fitzpatrick suborned perjury, we think a reasonable juror would discredit Mitchell's testimony upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony in the criminal trial. In short, based on the record before us, any reasonable juror would almost certainly credit Wecht over Mitchell and would therefore, more likely than not, harbor a reasonable doubt about Rivas's guilt.

*Rivas*, 687 F.3d at 546.[33]

Although the state collateral review court did not make any express findings as to prejudice, we are required to assume for the purpose of argument that it would have denied Rivas's ineffective-assistance claim also on that basis. *See Harrington*, 562 U.S. at 98 (holding that habeas petitioner must show "there was no reasonable basis for the state court to deny relief" regardless of "whether or not the state court reveals which of the elements in a multipart claim it

---

[33] The District Court stated that "the extent to which Dr. Mitchell's investigation was public knowledge . . . is unclear." *Rivas*, 2013 WL 4026844, at *27. There were, however, numerous news articles predating Rivas's March 1993 trial reporting on investigations into Dr. Mitchell and his office. *See, e.g.*, John O'Brien, *Mitchell's Policies Studied by Miller*, SYRACUSE POST-STANDARD, Nov. 25, 1989, at B1 ("The Onondaga County health commissioner has begun reviewing the policies and performance of the medical examiner's office, in light of recent publicity about questionable activities in the office."); *Coroner Boiling Bones in Parking Lot: Report*, SCHENECTADY GAZETTE, Oct. 28, 1989, at 47 ("Medical Examiner Dr. Erik Mitchell has drawn complaints recently for the way he runs his office. Last month, Mitchell was directed by County Executive Nick Pirro to halt his practice of donating body parts for medical research without the consent of the dead person's family. . . . Pirro has appointed an independent panel of three forensic pathologists to review [Mitchell's handling of a separate] case."); *see also* William Kates, *Who Really Killed Nanette Gordon?*, THE JOURNAL, Oct. 9, 1989, at 1 ("The [victim's] family has assailed the competency of Mitchell's investigation and questioned whether the medical examiner could be objective because he was once a suspect in Gordon's death."); Jim O'Hara, *Medical Examiner Denies He Ordered Staff to Dice Body Parts*, SYRACUSE HERALD-JOURNAL, Mar. 5, 1993, at A1 ("Onondaga County Medical Examiner Erik Mitchell today dismissed as 'lies, insults and slander' a series of allegations leveled against him by employees, including a complaint he had staff dice brains and other body parts to be flushed away.").

found insufficient").[34] To the extent it would have so ruled, we conclude that such a decision would have been objectively unreasonable for the reasons set forth above and in our prior opinion.

---

[34] In denying the other portions of Rivas's § 440.10 motion, the state collateral review court held that "defendant cannot show that the fact that brain 'tissue' slides never existed impacted the jury verdict, because it is still not apparent that Dr. Mitchell wasn't referring to a review of the photographic slides that were contained in the medical examiner's file." *People v. Rivas*, No. 92–2794, slip op. at 8 (N.Y. Sup. Ct. Sept. 8, 2000). This argument, however, overlooks the fact that the prosecutor told the jury in his closing statement that Dr. Mitchell had "review[ed] autopsy sectional slides of the brain." Trial Tr. at 1083; *see also Rivas*, 687 F.3d at 525 n.19. It also overlooks the fact that Dr. Wecht's unchallenged affirmation states that "[d]ecomposition of internal organs is highly variable, and cannot be used for the determination of the time of death. . . . The examination of the brain or brain slides is an unreliable aid in estimating the time of death." Aff. of Cyril H. Wecht, dated June 11, 1999, ¶¶ 10, 14, *available at Rivas v. Fischer*, No. 01-cv-1891, ECF No. 56-2 at 21–22 (N.D.N.Y. Sept. 18, 2009); *see also Rivas*, 687 F.3d at 525 n.19.

The state collateral review court also held that the investigation of Dr. Mitchell "revealed misconduct relative to disposal of bodies and body parts by the office, and while those activities may have contributed to Dr. Mitchell's stepping down from his office, there have never been any allegations that he testified falsely in any trials." *People v. Rivas*, No. 92–2794, slip op. at 13 (N.Y. Sup. Ct. Sept. 8, 2000). As noted above and in our prior opinion, however, this material would have been invaluable in impeaching Dr. Mitchell's credibility, not necessarily because of the nature of the investigations themselves, but because of Dr. Mitchell's possible conflict of interest in rendering his opinions in Rivas's prosecution while under pending investigation by state and local investigators, including possibly those who were prosecuting Rivas. *See Rivas*, 687 F.3d at 546.

## CONCLUSION

To summarize: We hold that it was an unreasonable application of *Strickland* for the state collateral review court to deny Rivas's claim of ineffective assistance of counsel. Accordingly, we

(1) **REVERSE** the judgment of the District Court, and

(2) **REMAND** the cause.

On remand, the District Court shall issue a writ of habeas corpus to Rivas on the sixtieth calendar day after the issuance of our mandate unless New York State has, by that time, taken concrete and substantial steps expeditiously to retry Rivas.

The mandate shall issue forthwith. If further proceedings arising from Rivas's habeas petition are required in this Court, the parties shall inform the Clerk of this Court. Jurisdiction will then be automatically restored to this Court without need for a new notice of appeal. After jurisdiction is restored, the Clerk shall set an expedited briefing schedule, and, in the interest of judicial economy, the matter will then be heard by this panel on letter briefs.